## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

YERUCHAM STONE,

        Petitioner,

        v.

BRACHA LEIBOWITZ STONE,

        Respondent.

Civil Action No. 19-17962 (MAS) (ZNQ)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

This matter comes before the Court upon Petitioner Yerucham Stone's ("Petitioner") September 12, 2019 petition (the "Petition") (ECF No. 1) for the return of his three minor children (the "Minor Children") to Israel pursuant to the 1980 Hague Convention on Civil Aspects of International Child Abduction ("Hague Convention" or "Convention"), implemented through the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 9001 *et seq*. On October 15, 2019, Respondent Bracha Leibowitz Stone ("Respondent") responded to the factual allegations of the Petition and opposed the return of the Minor Children to Israel. (ECF No. 29.) The parties jointly filed a Statement of Stipulated Facts ("SSF") on October 30, 2019. (ECF No. 38.) On November 7, 2019, the Honorable Judge Zahid N. Quraishi, U.S.M.J., granted limited discovery, to be produced on a rolling basis and to conclude no later than November 19, 2019. (ECF No. 45.) The parties filed dueling motions for summary judgment on November 8, 2019. (ECF Nos. 48, 49.) On the same day, the parties jointly filed an Additional Statement of Stipulated Facts ("ASSF"). (ECF No. 46.) On November 18, 2019, Petitioner filed a memorandum in support of his motion (ECF No. 55) and Respondent filed an opposition to Petitioner's motion (ECF No. 56).

The Court held an evidentiary hearing on November 26, 2019 ("November 26 Hearing"). Having heard testimony and having reviewed the relevant submissions, the Court now makes the following findings of fact and conclusions of law[1] pursuant to Rule 52 of the Federal Rules[2] of Civil Procedure. For the reasons set forth below, the Petition is denied.

## I.    **FINDINGS OF FACT[3]**

As an initial matter, the Court evaluates the credibility of the two parties based upon their written submissions and the live testimony they gave at the November 26 Hearing. Overall, the Court found Respondent to be a more credible witness. Although Petitioner generally appeared to give honest answers on direct examination, his responses on cross-examination were far more evasive and at times argumentative. The Court, accordingly, conferred greater weight to Respondent's testimony.

---

[1] To the extent any findings of fact are more appropriately categorized as conclusions of law, and vice versa, they are adopted as such.

[2] Hereinafter, all references to a "Rule" or "Rules" refer to the Federal Rules of Civil Procedure, unless otherwise noted.

[3] Much of the evidence upon which the Court must rely and make its determination was the testimony of Petitioner and Respondent, which conflicted at times. In evaluating the testimony, the Court undertook an individualized credibility assessment of each witness and assigned the appropriate weight to the testimony based on the Court's conclusions with respect to credibility. In assessing the credibility of each witness, the Court has taken into consideration "how well each witness was able to recall and describe the things testified to, the manner of the witness while testifying, whether the witness had an interest in the outcome of the case or any bias or prejudice concerning any party or matter involved in the case, how reasonable the witness' testimony was considered in light of all the evidence in the case, and whether the witness' testimony was contradicted by what that witness had said or done at another time, by the testimony of other witnesses, or by other evidence." *Sasson v. Sasson*, 327 F. Supp. 2d 489, 492 n.2 (D.N.J. 2004) (internal citations omitted); *see Silvestri v. Oliva*, 403 F. Supp. 2d 378, 380 n.2 (D.N.J. 2005). In general, unless otherwise noted, the Court found Respondent to be the more credible witness and credited her testimony over that of Petitioner.

### A.    **Background**

Petitioner and Respondent are both United States citizens who were born in New Jersey. (Resp't Aff. ¶¶ 3, 4, ECF No. 1-1.)[4] Both parties and the Minor Children are Orthodox Jews. (SSF ¶ 6, ECF No. 38.) Nearly all of the parties' close familial relatives live in the United States. (Resp't Aff. ¶¶ 3-4.) Petitioner's parents and one of his six siblings live in New Jersey. (SSF ¶¶ 16-17.) Respondent's father and three of her eight siblings live in New Jersey. (*Id.* ¶¶ 11-14.) One of Respondent's siblings lives in Israel (SSF ¶ 15), but none of Petitioner's siblings live in Israel (Tr. 70:16-17.)[5]

Petitioner is a Talmudic scholar who began studying in Israel in or around 2010. (Pet. ¶ 11, ECF No. 1.) Petitioner and Respondent met in Israel in August 2013, and married in a religious ceremony in New York on December 5, 2013. (SSF ¶¶ 3-4.) The couple have three minor children: D.S., age 5; R.S., age 3; and M.S., age 1.[6] (*Id.* ¶ 5.) Although the Minor Children were born in Israel, they are solely citizens of the United States. (*Id.* ¶¶ 7-9.) Upon their births, Petitioner and Respondent obtained Consular Reports of Birth Abroad and United States passports for each of the Minor Children. (*Id.* ¶ 19.) The parties also declined Israeli citizenship on behalf of the Minor Children. (Tr. 144:5-8; SSF ¶ 8; *see also* Resp't Aff. ¶ 4.) Throughout the duration of their

---

[4] On August 30, 2019, Respondent filed an Order to Show Cause against Petitioner in New Jersey Superior Court, captioned *Bracha Leibowitz Stone v. Yerucham Stone*, No. FD-15-000195-20. (SSF ¶ 61.) Petitioner attached the filing as an Exhibit to his Petition and the Court references it to provide context as needed.

[5] The Court's citations to the Rough Uncertified Transcript of the November 26 Hearing are denoted, "Tr."

[6] To protect the identity of the Minor Children, pursuant to Rule 5.2, the Court will not state their names or dates of birth and refers to them in this Opinion by their initials.

marriage, the parties primarily resided in Israel and made frequent return trips to the United States. (SSF ¶¶ 26-33.)[7]

**B.** **Life in Israel**

In or around August 2018, Petitioner signed a five-year lease on an apartment ("Israel Apartment"), which was co-signed by one of Respondent's brothers, Chesky Leibowitz. (Tr. 111:15-17; Tr. 113:2-13; SSF ¶¶ 15, 25.) The parties subsequently invested the equivalent of approximately $10,000 to renovate the apartment. (Pet. ¶ 13.) The monthly rent for the apartment is the equivalent of approximately $776.96. (ASSF ¶ 4, ECF No. 46.)[8] Petitioner entered Israel pursuant to an A2 student visa, which expires in 2023. (Pet. ¶ 10.) The record does not reflect that Petitioner has applied for any form of permanent Israeli residency. (*See, e.g., id.* at ¶¶ 7-8, 20-21.) Petitioner's Talmudic studies can encompass eight to eleven hours of study and lecture per day, up to six days per week. (Tr. 4:5-12.) Petitioner testified he aspires to become "as accomplished [a] Talmud scholar as [he] possibly can." (Tr. 5:3-4.)

Respondent, as the spouse of an individual present on an A2 visa, is permitted to remain in the country on an A4 accompaniment visa. (R-14, Tr. 159:9-11.)[9] Because Petitioner is present in

---

[7] The parties spent approximately five weeks in the United States in 2014 (SSF ¶¶ 26-27); approximately six weeks in 2015 (*Id.* ¶ 28), approximately five to six weeks in 2016 (*Id.* ¶¶ 29-30), approximately four weeks in 2017 (*Id.* ¶¶ 31-32), and approximately one week in 2018. (*Id.* ¶ 33.) The cost of these trips was usually split between the parents of the parties. (Tr. 112:23-113:1.)

[8] Unlike other monetary figures, the parties only provide the rental cost in terms of Israeli shekels. The Court used the exchange rate as of December 10, 2019, to convert the figure to U.S. Dollars, for ease of comparison.

[9] The Court uses this naming convention to reference exhibits marked in evidence or admitted during the November 26 Hearing. Exhibits denoted with an "R" are Respondent's Exhibits; exhibits denoted with a "P" are Petitioner's Exhibits; and exhibits denoted with a "J" are joint exhibits. The Court includes the transcript citation for exhibits discussed during the hearing.

Israel on a student visa, neither he nor Respondent is legally permitted to work in the country. (SSF ¶ 21; *see also* R-14.) While in Israel, Petitioner studied at Yeshiva Hagram and received a stipend equivalent to $372.07 per month. (ASSF ¶ 1.) This stipend was freely given by Yeshiva Hagram, and Petitioner had no contractual right to any payments. (Tr. 57:2-9.) Beyond Petitioner's stipend, the parties were supported almost entirely by their parents. Respondent's father sent $1,000 dollars per month for the first five years of the parties' marriage. (ASSF ¶ 2.) Respondent's father, however, was no longer able to continue that level of financial support and discontinued payments. (Tr. 155:16-18.) Petitioner's parents contributed between $500 and $1,000 per month and permitted the couple to use the family's credit card. (ASSF ¶ 3.) Petitioner testified his parents granted the parties unlimited access to their credit card while Respondent testified that they were limited to charging $500 per month. (*Compare* Tr. 39:6-14, *with* Tr. 155:14-15.) The Court did not find Petitioner's testimony on this subject credible. The Court, however, did find Respondent's testimony credible.

The parties paint vastly different pictures of life in Israel. Respondent's cousin, Baruch Leibowitz, stated in his declaration that the parties' "financial circumstances made it difficult for them to feed and take care of their children." (Decl. of Baruch Leibowitz ¶ 3, J-33, Tr. 37:22-38:5.) Respondent testified there were several times when the family could not afford to buy food for the Sabbath. (Tr. 110:21-23.) Baruch Leibowitz also testified that he received multiple calls from Respondent when the family could not afford any food other than the bread they had in their apartment. (Tr. 185:25-186:1, 2.) To assist them, Baruch Leibowitz purchased the parties a freezer full of chicken. (Tr. 186:2-4.) Petitioner denies this and testified there was never a time when it was a challenge to feed or take care of the Minor Children. (Tr. 38:11-22.) The Court found Respondent's testimony on this subject to be more credible than Petitioner's. Respondent alleges

that Petitioner "began exercising more and more control over [her], refusing to give [her] any funds, or . . . allow [her] to buy any clothing" and also describes a general feeling of isolation. (Resp't Aff. ¶¶ 5, 7.)

Beyond financial matters, Respondent and the Minor Children have great difficulty communicating in Israel because they only speak English and do not speak Hebrew.[10] (Tr. 110:11-15.) While they lived in Israel, the parties' eldest child, D.S., was enrolled in a Yiddish-speaking school, a language she also does not speak. (Tr. 110:17-20.) Respondent testified that D.S. struggled with the language barrier and was miserable when she came home from school. (Tr. 110:19-21.) R.S., similarly, was enrolled in a school where she did not speak the language that was primarily spoken at the institution. (Tr. 156:3-7.)

When the parties traveled within the country, they primarily did so either on foot or via public transportation because they did not own a car. (Tr. 111:23-112:2; SSF ¶ 22.) Although Respondent does have a sibling, Chesky Leibowitz, who lives in Israel, she avers that "[Petitioner] rarely allowed [her] to visit [him]." (Resp't Aff. ¶ 3.) The parties usually celebrated the Sabbath alone. (Tr. 116:7.) If they did have company, their guests were usually friends of Petitioner. (Tr. 116:8-9.) Although the Court does not believe Petitioner was directly dishonest in his testimony, it does find his responses failed to provide a complete and accurate account of the family's life in Israel. The Court found Respondent's testimony on this subject highly credible.

In February 2019, Respondent told Petitioner that a family emergency required her to return to New Jersey. (Resp't Aff. ¶ 8.) Respondent testified that she fabricated the story because she "was pretty much sure that [Petitioner] would not allow [her] to leave if [she] were to tell him the truth of why [she] was leaving." (Tr. 110:1-3; *see also* Resp't Aff. ¶ 8.) On February 23, 2019,

---

[10] Respondent testified that she is able to read Hebrew. (Tr. 111:13-14.)

Respondent flew to the United States, along with M.S., on roundtrip tickets, with a stated return date of March 7, 2019. (SSF ¶ 37.)

### C.    <u>Post-February 23, 2019</u>

Upon Respondent's arrival to the United States, the parties engaged in a telephone conversation wherein Respondent admitted her deception to Petitioner. (Tr. 41:14-15.) Respondent told Petitioner that the actual reason for her trip to the United States was personal unhappiness and that she felt she needed "a break." (Tr. 42:1-3, Tr. 116:18.) Respondent asked Petitioner to travel to the United States so the two could share "vacation time" together, indicating she thought such a trip might ease her personal unhappiness. (Tr. 67:3-8.) On February 27, 2019, Petitioner left D.S. and R.S. with a babysitter and flew to the United States on a roundtrip ticket, with a planned return date of March 7, 2019. (SSF ¶ 38.) Respondent expressed to Petitioner that she wished to spend a few additional days in the United States and asked him to return to Israel and resume caring for D.S. and R.S. (Pet. ¶ 23.) On March 7, 2019, Petitioner returned to Israel, leaving Respondent and M.S. in New Jersey. (Tr. 68:3-5; SSF ¶ 39.) After Petitioner arrived in Israel, the parties had a telephone conversation wherein Respondent admitted she did not know if she "ha[d] the strength to go back to [her] life [in Israel.]" (Tr. 119:12-18.) She asked Petitioner to return to the United States "at least until after Passover" so they could "work things out together and try to stabilize [their marriage.]" (*Id.*) On March 14, 2019, Petitioner, D.S., and R.S. flew to the United States on roundtrip tickets, with a planned return date of April 30, 2019. (SSF ¶ 40.) Petitioner, D.S., and R.S. never used the return tickets. (Tr. 82:8-17.) Prior to traveling, Petitioner did not pack up property in the Israel Apartment and did not bring all of D.S. and R.S.'s belongings with them. (Tr. 17:18-18:6.)

On or about March 24, 2019, once all five members of the family were present in New Jersey, Respondent informed Petitioner that she would not return to Israel. (Tr. 61:1-12.) Petitioner testified that after this pronouncement, he never agreed to remain personally in the United States, nor did he explicitly agree that the Minor Children would remain in the United States. (Tr. 20:15-21.) The Court found Petitioner's testimony on this subject to be credible. Respondent admits Petitioner never expressed a desire to remain in the United States. (Tr. 127:1-3.) Respondent further testified that while she knew Petitioner preferred to live in Israel, she "thought he decided to put our family as a preference before his preference of living in Israel." (Tr. 127:4-12.) The Court also found Respondent's testimony to be credible. The Court, nevertheless, found that Petitioner's subsequent actions demonstrated his willingness to remain in the United States and vitiated any explicit opposition he may have previously expressed.

On or about March 25, 2019, D.S. began attending kindergarten at Yeshiva Meoros Rochel Leach School ("Meoros"), in Lakewood, New Jersey. (Decl. of Rabbi Avrohom Landau ¶ 7, J-28, Tr. 157:9.) Meoros was operated by Rabbi Avrohom Landau ("Rabbi Landau"), a cousin of Respondent. (*Id.* ¶ 4.) Rabbi Landau waived D.S.'s tuition as a favor to the family. (*Id.*) D.S. attended Meoros until the end of the school year, on or around June 21, 2019. (*Id.* ¶ 7.) On or about March 28, 2019, R.S. began attending Rivkie Schuster Play Group, where her preschool teacher described her as a "social, very alert child and eager learner." (Decl. of Rivkie Schuster ¶¶ 5, 7, J-30, Tr. 157:9.) At some point during March 2019, Petitioner began attending lectures on the Talmud at Kollel Eitz Chaim (the "Kollel"), in Lakewood, New Jersey.[11] (Tr. 75:13-14.)

---

[11] A Kollel is an institution where Orthodox Jewish men "pursue their advanced . . . Talmudic studies." (Tr. 75:15-18.)

During their time in the United States, until or around May 14, 2019, the parties primarily lived in the basement of Menachem Leibowitz, Respondent's brother, in Toms River, New Jersey. (Tr. 61:11-12, Tr. 67:21-23.) In April 2019, the parties executed a month-to-month lease on an apartment in Lakewood, New Jersey ("Lakewood Apartment"), to begin on May 14, 2019. (SSF ¶ 48.) On or about April 12, 2019, Petitioner submitted an application to the appropriate New Jersey state entities for Medicaid and other benefits. (Tr. 22:3-14.) To secure these benefits, Petitioner averred on the application forms that he, Respondent, and the Minor Children were all residents of New Jersey. (Tr. 58:4-17.) Throughout the time the parties were renting the Lakewood Apartment, Petitioner continued to pay rent, utilities, and local taxes for the Israel Apartment. (Tr. 55:19-24.) The money to make these payments came from his parents. (Tr. 55:25-56:1.)

At some point during the Spring of 2019, Petitioner sought to secure a position at the Kollel. (ASSF ¶ 5.) To that end, Petitioner requested Baruch Leibowitz's assistance with securing a study position at the Kollel. (*Id.*) Baruch Leibowitz's father had been a longtime friend of Rabbi Moshe Shimon Shapiro ("Rabbi Shapiro"), the head of the Kollel. (Decl. of Baruch Leibowitz ¶ 4.) Baruch Leibowitz agreed to reach out to Rabbi Shapiro and on May 1, 2019, Petitioner had an interview at the Kollel. (Tr. 75:24-25; *see also* Decl. of Baruch Leibowitz ¶ 4.) Baruch Leibowitz averred in his sworn declaration that he understood Petitioner to be seeking a long-term, permanent position at the Kollel, and because of that, he agreed to facilitate Petitioner's introduction to the highly respected Rabbi Shapiro.[12] (Decl. of Baruch Leibowitz ¶ 5.) Petitioner also sought assistance to secure a study position from some of his friends who studied at the Kollel. (Tr. 77:12-17.)

---

[12] Baruch Leibowitz stated in his Declaration: "Rabbi Shapiro's Kollel is a very respected institute of Jewish learning, and [Petitioner] was eager to be accepted there. I arranged for an interview to be had, and I endorsed [Petitioner] as a student. I understood [Petitioner] sought a permanent position. If he had ever indicated otherwise, I would not have requested that Rabbi Shapiro meet with him." (Decl. of Baruch Leibowitz ¶ 5.)

Ultimately, Petitioner was placed on a wait list for admission. (Tr. 76:10-12.) On May 5, 2019, Petitioner began studying at Yeshivas Be'er Yitzchok in Elizabeth, New Jersey. (Tr. 83:11-84:1.)

In or around May 2019, Petitioner spoke with Rabbi Sruly Blobstein ("Rabbi Blobstein") about potentially securing a job for Respondent. (ASSF ¶ 9.) Petitioner informed Rabbi Blobstein that Respondent had told him she did not wish to return to Israel. (Decl. of Rabbi Sruly Blobstein ¶ 5, J-32.) Rabbi Blobstein put Petitioner in contact with the owner of the Rockabye Baby Nurse Agency ("Rockabye Agency"). (*Id.* ¶¶ 5-6; *see also* ASSF ¶ 10.) Respondent was hired at the Rockabye Agency at the end of May 2019. (Decl. of Rabbi Sruly Blobstein ¶ 6.) Petitioner testified that he sought out this particular opportunity for Respondent in part because the Rockabye Agency had a satellite office in Israel. (Tr. 104:11-18.) Petitioner further stated he thought there was a possibility that this job could continue "in Israel when [he] returned." (*Id.*) The Court did not find Petitioner's testimony on this subject credible, particularly given Petitioner's prior acknowledgement that his student visa and Respondent's accompaniment visa legally preclude them from earning income in Israel.

Between May and August 2019, Petitioner attempted, unsuccessfully, to sublet the Israel Apartment. (Tr. 99:6-15.) On July 1, 2019, Petitioner traveled to Israel for the unveiling of his grandmother's grave, leaving the Minor Children with Respondent in New Jersey for ten days before returning to the United States. (SSF ¶ 52.) Towards the end of July, after Petitioner returned to the United States, Respondent moved out of the Lakewood Apartment, leaving the Minor Children in Petitioner's overnight care. (Tr. 132:4-7; Tr. 60:8-13.) Respondent testified the parties were fighting frequently and she did not want to upset the Minor Children. (Tr. 132:9-15.) Respondent described a home environment where Petitioner "badgers [her], belittles [her], and exercises 24/7 control over [her]" and notes that Petitioner is "harsh and . . . punitive when his

10

demands are not met." (Resp't Aff. ¶¶ 14-15.) After leaving the Lakewood Apartment, Respondent would pick up the Minor Children "from either day camp [or] the babysitter" and then watch them during the afternoon. (Tr. 132:22-133:1.) The parties and the Minor Children would have dinner together at the Lakewood Apartment before Respondent departed for the night. (Tr. 133:2-8.) This arrangement continued for approximately three weeks. (Tr. 133:10.)

On or around August 11, 2019, Respondent resumed living in the Lakewood Apartment. (Tr. 91:24-92:3.) At some point prior to August 22, 2019, Petitioner took exclusive possession of the Minor Children's passports and refused to return them to Respondent. (Tr. 92:8-15.) In addition to the passports, Petitioner was in possession of the Minor Children's Social Security cards, birth certificates, and Medicaid cards. (Resp't Aff. ¶ 17.)

In the period after Respondent returned to the Lakewood Apartment, Respondent alleges Petitioner threatened to take the Minor Children back to Israel, over her objection. (*Id.* ¶ 12.) On or about August 22, 2019, without informing Petitioner, Respondent moved herself and the Minor Children out of the Lakewood Apartment and back into Menachem Leibowitz's home. (Tr.135:18-24; Resp't Aff. ¶ 13.) Petitioner avers that he returned home one afternoon to the Lakewood Apartment, found the Minor Children missing, and observed Respondent and Menachem Leibowitz removing suitcases filled with "clothing and possessions." (Pet. ¶ 34.) Later, Petitioner contacted Respondent and asked for permission to visit with the Minor Children. (Tr. 136:5-12.) Respondent stated she was happy to arrange parenting time for Petitioner, on the condition that he surrender the Minor Children's passports, Medicaid cards, and other documents to a third party. (Tr. 136:9-12.)

Respondent alleges that Petitioner then stole her iPhone and refused to return it to her. (Resp't Aff. ¶ 17.) Petitioner denies this claim. (Tr. 95:20-23.) When confronted, on cross-

examination, with the allegation that a phone application identified the location of Respondent's stolen iPhone as being at the home of Petitioner's parents, Petitioner responded, "that would be very troubling." (Tr. 96:1-7.) The Court did not find Petitioner's answer to this question or his denial of culpability credible and found his answer was given in a mocking tone. Respondent also described her fear that Petitioner was attempting to access or already had accessed her personal communications. (Resp't Aff. ¶ 14.) At some point in the week preceding the hearing, Petitioner had a phone conversation where he told one of Respondent's friends that divorce was "on his mind" upon his potential return to Israel.[13] (Tr. 86:1-11.)

On or about September 5, 2019, D.S. began another year of kindergarten at Meoros. (Decl. of Rabbi Landau ¶ 7.) One of D.S.'s teachers at Meoros stated that D.S.'s "reading and writing skills were not strong enough for her to advance to [the next grade level]" and, therefore, she would be repeating kindergarten. (Decl. of Basya Bamberger ¶ 5, J-27, Tr. 157:8.) Basya Bamberger also noted that despite this, D.S. is a "happy and imaginative child" who is "thriving" in the school environment. (Id. ¶ 6.)

On September 12, 2019, Petitioner filed the instant petition. On September 27, 2019, the Court took possession of travel and identification documents for the Minor Children, pursuant to a joint stipulation between the parties. (Joint Stipulation, ECF No. 18.) On October 17, 2019, Petitioner served Respondent with a copy of an Israeli Custody Complaint, filed in Family Court in Israel, seeking a custody determination by that court ("Israeli Family Court Filing"). (ECF No. 33-2.)[14]

---

[13] It is unclear to the Court whether a divorce would render Respondent's A4 accompaniment visa invalid and require her expulsion from Israel.

[14] The case is captioned, *Yerucham Stone v. Bracha Tova Stone*, No. 61330-09-19.

## II.  CONCLUSIONS OF LAW

### A.  Jurisdiction

The Court has jurisdiction under 22 U.S.C. § 9003(a) which provides, in relevant part, that "[t]he courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the Convention." The United States and Israel are "contracting states" under the terms of the Convention. *See, e.g. Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001). This Court, accordingly, has jurisdiction over this matter.

### B.  Hague Convention Overview

The Hague Convention "was adopted in 1980 in response to the problem of international child abductions during domestic disputes." *Abbott v. Abbott*, 560 U.S. 1, 8 (2010). Under the Convention, district courts have the authority to order the return of a child who has been wrongfully removed or retained. *See Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006). The Convention's primary objectives are "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting State." Hague Convention art. 1. The petitioner bears "the initial burden of showing that the child was habitually resident in a State signatory to the Convention and was wrongfully removed to a different State, as defined by Article 3" of the Convention. *Monzon v. De La Roca*, 910 F.3d 92, 96 (3d Cir. 2018).

Under the Convention, the removal or retention of a child is wrongful, where:

> (a.) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

13

> (b.) at the time of the removal or retention, those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention art. 3. The petitioner must prove by a preponderance of the evidence that the removal or retention was wrongful. 42 U.S.C. § 9003(e)(1). It is well settled that the Convention was not "designed to settle international custody disputes, but rather to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases." *Karkkainen*, 445 F.3d at 287 (3d Cir. 2006) (citing *Baxter v. Baxter*, 423 F.3d 363, 367 (3d Cir. 2005)).

### C.   Prima Facie Case for Wrongful Removal or Retention of the Minor Children

The Third Circuit has articulated four considerations relevant to determine whether a removal or retention was wrongful. Courts should consider: (1) when the removal or retention at issue occurred, (2) the child's place of habitual residence immediately prior to the removal or retention, (3) whether the removal or retention violated the petitioner's custody rights, and (4) whether the petitioner was exercising those rights at the time of removal or retention. *Baxter*, 423 F.3d at 368; *see also Mozes*, 239 F.3d at 1070.

If the petitioner successfully makes out a prima facie case of wrongful removal or retention, "the burden shifts to the respondent to prove an affirmative defense against the return of the child to the country of habitual residence." *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 271 (3d Cir. 2007) (internal quotations omitted). Even if a respondent is able to demonstrate that a defense applies, courts have the discretion to order the return of the child. *Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995).

## 1. Date of Removal or Retention

The date of removal or retention is "the date beyond which the noncustodial parent no longer consents to the [children's] continued habitation with the custodial parent and instead seeks to reassert custody rights, as clearly and unequivocally communicated through words, actions, or some combination thereof." *Blackledge v. Blackledge*, 866 F.3d 169, 179 (3d Cir. 2017), *cert. denied*, 138 S. Ct. 1449 (2018). The date of removal or retention "establish[es] the relevant date of [the children's] habitual residence for purposes of the Convention." *Karkkainen*, 445 F.3d at 290. "[R]emoval refers to the parent's physical taking of the child out of the country; [] retention refers to the parent's keeping the child out of the country." *De La Vera v. Holguin*, No. 14-4372, 2014 WL 4979854, at *6 (D.N.J. Oct. 3, 2014) (citing *Baxter*, 423 F.3d at 369).

## 2. The Children's Habitual Residence Immediately Prior to Such Removal or Retention

The term "habitual residence" is not specifically defined by the Hauge Convention. *Whiting v. Krassner*, 391 F.3d 540, 546 (3d Cir. 2004). "The inquiry into a child's habitual residence is not formulaic; rather, it is a fact-intensive determination that necessarily varies with the circumstances of each case." *Id.* "Though the Courts of Appeals have employed slightly different tests for habitual residence, each test has in common the goal of determining where a child's home is at the time of removal or retention." *Karkkainen*, 445 F.3d at 291. "These tests facilitate the primary objective of the Hague Convention: to ensure stability in a child's family and social environment." *Id.* In the Third Circuit, a child's habitual residence is the place "where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." *Feder*, 63 F.3d at 224. Courts balance the "child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there." *Id.* "This approach considers a child's experience in and contacts with her surroundings, focusing on

15

whether she "develop[ed] a certain routine and acquire[d] a sense of environmental normalcy" by "form[ing] meaningful connections with the people and places [she] encountered" in a country prior to the retention date. *Karkkainen*, 445 F.3d at 291-92 (quoting *Whiting*, 391 F.3d at 550-51); *see also Mozes*, 239 F.3d at 1078-79 (describing acclimatization as being "firmly embedded in the new country" or "being well-adjusted in one's present environment").

"The first step towards acquiring a new habitual residence is forming a settled intention to abandon the one left behind." *Maxwell v. Maxwell*, 588 F.3d 245, 251 (4th Cir. 2009). When determining whether a change has occurred, courts will consider whether there has been "an actual change in geography" and a "passage of an appreciable period of time, one sufficient for acclimatization" by the children to the new environment. *Papakosmas v. Papakosmas*, 483 F.3d 617, 622 (9th Cir. 2007) (quoting *Mozes*, 239 F.3d at 1078).

### 3. Whether Respondent's Removal or Retention of the Child Breached Petitioner's Custody Rights Under the Law of the Contracting State

"Custody rights, under the Hague Convention, 'include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.'" *Tsai-Yi Yang*, 499 F.3d at 275 (citing Hague Convention art. 5(a)). To determine whether a petitioner had custody of a child, courts examine "the country of origin's custody laws to determine whether the party seeking the child's return had custody rights in that country . . . at the time the child was [retained]." *In re Application of Adan*, 437 F.3d 381, 391 (internal quotation marks and citation omitted). A removal or retention is "wrongful" where "it is a breach of the rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the wrongful removal or retention." Hague Convention art. 3(a).

### 4. Whether Petitioner was Exercising His Custody Rights at the Time of Retention

In the Third Circuit, the burden on the petitioner to establish that he was exercising his custody rights is a low one. *Holguin*, 2014 WL 4979854, at *9; *see also Friedrich*, 78 F.3d at 1065-66 (finding the test for the non-exercise of custody rights was stringent). "Very little is required of the applicant in support of the allegation that custody rights have actually been or would have been exercised. The applicant need only provide some preliminary evidence that he or she actually exercised custody of the child, for instance, took physical care of the child." *Adan*, 437 F.3d at 391 (citation omitted).

### D. Analysis

Petitioner asserts that this is a case of both wrongful removal, as to M.S., and wrongful retention as to all of the Minor Children. (Pet. Mot. 5, ECF No. 48.) The Court addresses each of Petitioner's arguments in turn.

### 1. The Wrongful Removal of M.S.

Petitioner argues that Respondent wrongfully removed M.S. to the United States on February 23, 2019, when she traveled to New Jersey after lying to Petitioner about the reason for her trip. First, the Court must determine M.S.'s habitual residence and the date of the alleged removal. *Baxter*, 423 F.3d at 368. Here, M.S. is one year old and has lived nearly his entire life in Israel, except for one trip to the United States. The Court, therefore, finds M.S.'s habitual residence immediately preceding his removal to the United States was Israel. Respondent traveled with M.S. from Israel to the United States on February 23, 2019. The date of the alleged wrongful removal as to M.S., therefore, is February 23, 2019.

The critical inquiry for this analysis, therefore, is whether the removal was "wrongful." As noted, *supra*, a removal or retention is wrongful when it breaches the custody rights of a parent

who is exercising those rights. Hague Convention art. 3(a). Although Petitioner was no doubt exercising his custody rights with regard to M.S., the Court finds that Respondent's removal of M.S. to the United States did not breach or otherwise impair those rights. While Respondent's stated reason for traveling to the United States was false, Petitioner consented to M.S. traveling with her. Moreover, shortly after arriving in the United States, Respondent called Petitioner and explained that the reason she had given for her trip was false. Respondent's misrepresentation as to her personal impetus for the trip, alone, does not constitute a wrongful removal. *See, e.g.*, *Roche v. Hartz*, 783 F. Supp. 2d 995, 1002 (N.D. Ohio 2011) (finding respondent-mother's use of "misrepresentation to induce [petitioner-father] into agreeing to the trip" did not constitute a wrongful removal).

Respondent further invited Petitioner to come to the United States so that the parties might be able to enjoy a short vacation and work on their marital difficulties. On February 27, 2019, Petitioner traveled to the United States and met with Respondent. Petitioner has never alleged Respondent denied him access to M.S. during this time. On March 7, 2019, Petitioner left M.S. in New Jersey with Respondent and returned to Israel. At no point during this time period, nor during the months preceding August 22, 2019, did Petitioner express to Respondent that he no longer consented to M.S.'s continued habitation with her in New Jersey. Nor did Respondent prevent Petitioner from exercising his legal custody rights. The Court, accordingly, finds that as of February 23, 2019, Petitioner's custody rights were not breached. The Court, therefore, finds that M.S. was not wrongfully removed from Israel.

## 2. The Wrongful Retention of the Minor Children

Petitioner argues that all the Minor Children were wrongfully retained by Respondent, in violation of his custody rights.

### a. *Whether Petitioner was Exercising His Custody Rights at the Time of the Retention*

Here, there is no dispute among the parties that both Petitioner and Respondent were exercising their custody rights throughout the duration of the relevant time period. The Court, accordingly, omits a detailed discussion of this portion of the framework from its analysis.

### b. *Date of Retention*

As with Petitioner's claim of wrongful removal of M.S., the Court begins by determining the date the alleged wrongful retention of the Minor Children occurred. Petitioner argues that by the time the Petition was filed, the "[Minor Children] had been definitively wrongfully retained in the United States [for] approximately four and one[-]half months." (Pet'r's Mot. 8.) Petitioner's assertion would place the date of wrongful retention at some time towards the end of April or early May 2019. This date, however, conflicts with Petitioner's Israeli Family Court Filing, wherein he stated that as of August 22, 2019, "[Respondent had] been preventing him from having any access to [the Minor Children]" and erroneously stated Respondent was illegally holding the Minor Children in New York. (Israeli Family Court Filing ¶¶ 29-30; *see also* Tr. 94:3-14.) Furthermore, this assertion conflicts with the actions taken by Petitioner subsequent to the alleged wrongful retention.

A child is wrongfully retained on "the date beyond which the noncustodial parent no longer consents to the child's continued habitation with the custodial parent and instead seeks to reassert custody rights, as clearly and unequivocally communicated through words, actions, or some combination thereof." *Blackledge*, 866 F.3d at 179. Here, although Petitioner may have expressed a desire to return to Israel, he never unequivocally communicated to Respondent that he no longer consented to the Minor Children's habitation with Respondent in New Jersey. To the contrary, Petitioner took many actions, including renting and moving into the Lakewood Apartment with

Respondent, seeking a permanent position at the Kollel, and completing a Medicaid application for the Minor Children, that indicated, at least, his temporary acceptance of the Minor Children's New Jersey residency. The Court finds, then, that the date of retention was not until August 22, 2019, when Respondent took the Minor Children from the Lakewood Apartment to Menachem Leibowitz's Home, that Petitioner withdrew his consent for the Minor Children's co-habitation with Respondent. Accordingly, for the purposes of the habitual residence analysis, the relevant date is August 22, 2019. *See Karkkainen*, 445 F.3d at 290 (holding the date of retention establishes the relevant date for determining a child's habitual residence, for purposes of the Hague Convention); *see also Blackledge*, 866 F.3d at 179 (holding that because the petitioner never "clearly and unequivocally withdrew his prior consent," the date of retention was the date the petition was filed).

### c. *Habitual Residence*

Turning to the analysis of the Minor Children's habitual residence, Petitioner encourages the Court to adopt the holding articulated by the Ninth Circuit in *Mozes*. In *Mozes*, the petitioner and respondent were Israeli citizens who had four children. 239 F.3d at 1069. The parties agreed their children "would profit from a chance to attend school" in the United States. *Id*. In April 1997, respondent-mother traveled with the four children to Beverly Hills where she "leased a home, purchase automobiles and enrolled the children in school." *Id*. In the subsequent dispute, the parties agreed that petitioner-father had consented to a fifteen-month stay in the United States. *Id*. One year after respondent and the children arrived in the United States, respondent filed a civil action in Los Angeles County Superior Court, "seeking a dissolution of the marriage and custody of the children." *Id*. Petitioner subsequently filed a petition in federal court under the Hague Convention. *Id*. The district court denied his petition. *Id*. The Ninth Circuit overturned the district court's ruling,

finding that it had given insufficient weight to the importance of shared parental intent under the Hague Convention. *Id.* at 1081. The *Mozes* court held that for a child to acquire a new habitual residence, the prior habitual residence must be "effectively abandoned by the shared intent of the parents." *Id.* at 1082. Petitioner further relies on *Tsai-Yi Yang*, where the Third Circuit adopted the holding of the *Mozes* court that a prior habitual residence "must be effectively abandoned by the shared intent of the parents for [the child] to acquire a new habitual residence." *Tsai-Yi Yang*, 499 F.3d at 272.

Petitioner asserts that there was never a shared intent between the parties to abandon Israel as the Minor Children's habitual residence. (Pet'r's Mot. 9.) Petitioner points to the lease the parties maintained on the Israel Apartment, the possessions they left behind in Israel, Respondent's admitted deception, and Petitioner's consistent desire to return to Israel as evidence supporting this claim. (*Id.*)

Petitioner's argument is unconvincing. The sum total of his actions, considered along with the acclimatization of the Minor Children, lead this Court to conclude that as of August 22, 2019, the Minor Children's habitual residence was New Jersey.

"To invoke the protection of the Convention, the taking or retention of a minor child must have occurred from a place where the child habitually resides." *Meredith v. Meredith*, 759 F. Supp. 1432, 1436 (D. Ariz. 1991). When "a child's initial move from an established habitual residence [is] clearly intended to be for a specific, limited duration," courts will generally find that the move does not constitute a change in habitual residence. *Whiting*, 391 F.3d at 549. When a move includes "a degree of settled purpose" courts have found that a child's habitual residence has changed. *Id.* This "settled purpose" may be for a limited period of time and does not require an intention to stay in the new location indefinitely. *Feder*, 63 F.3d at 223-24. Courts have considered various

motivations, including "[e]ducation, business or profession, employment, health, [and] family" when determining if a change in habitual residence has occurred. *Id.* "In cases where there is a dispute regarding a child's habitual residence, the representations of the parties cannot be accepted at face value, and courts must determine [habitual residence] from all available evidence." *Maxwell*, 588 F.3d at 252 (internal quotations omitted).

Here, while the Court agrees that the Minor Children's presence in New Jersey was initially intended, at least by Petitioner, to be for a limited period of time, their continued presence in the state, coupled with numerous actions taken by the parties, including Petitioner, constitutes a sufficient degree of settled purpose to change their habitual residence. Petitioner testified that it was always his desire to return to Israel. However, his repeated agreement to remain in New Jersey, his attempt to secure a position at the Kollel, his signing and repeated renewal of a month-to-month lease for the Lakewood Apartment, his efforts to find Respondent a paying job in New Jersey, and his application for New Jersey state Medicaid benefits in which he represented that he was a resident of New Jersey, evidence, at a minimum, an intention to reside in New Jersey for a limited period of time. As to Respondent's intent, she repeatedly asserted her desire for the Minor Children to live in New Jersey. (*See, e.g.*, Tr. 127:13-18.)

As to M.S., the court in *Karkkainen* held that "shared parental intent that a very young child will reside in a new country, even for a limited period of time, is sufficient to establish the child's habitual residence in that country." 445 F.3d at 296 (citing *Whiting*, 391 F.3d at 549; *Feder*, 63 F.3d at 223). The Court finds that there was shared parental intent between Petitioner and Respondent that M.S. reside in the United States, for at least a limited period of time. Here, although Petitioner claims M.S. was wrongfully removed on February 23, 2019, he subsequently traveled to the United States, spent time with Respondent and M.S. and then left them both in the

United States and returned to Israel. After the entire family was present in the United States, Petitioner lived with Respondent and the Minor Children and sought a permanent position at the Kollel. While Petitioner may have harbored a desire to ultimately return to Israel, his actions clearly establish his intent for M.S., and the rest of the Minor Children, to reside for a limited period in New Jersey. The *Feder* court also noted that familial motivations could be considered when determining if a settled purpose existed. 63 F.3d at 223-24. Petitioner testified that part of the reason he remained in New Jersey was to "keep the family together." (Tr. 58:22-59:9.) Petitioner's desire to return to Israel is not, without more, sufficient to alter his demonstrated shared intent that the Minor Children remain in New Jersey for a limited period of time.

After conducting a fact-intensive analysis, the Court finds that there was shared parental intent to remain in New Jersey, for at least a period of time. There was, therefore, shared parental intent to abandon Israel as the Minor Children's habitual residence and establish New Jersey as their new habitual residence.

The Court balances the "shared parental intent" with the "acclimatization of the child," in reaching its determination in this case. *See Whiting*, 391 F.3d at 546. "While [the admonitions of *Mozes*] are well taken, and courts should analyze the intentions of the parents, a court can not lose sight of the fact that the focus of the Convention is on the child." *Menechem v. Frydman-Menachem*, 240 F. Supp. 2d 437, 445 (D. Md. 2003). "While the intent of the parents is therefore clearly relevant, the factual circumstances attendant to the life of the child are equally important and relevant." *Id.* Turning to the perspectives of the Minor Children, when "child[ren are] old enough 'to develop a certain routine and acquire a sense of environmental normalcy,' acclimatization becomes the central inquiry." *Blackledge*, 866 F.3d at 181 (quoting *Whiting*, 391

F.3d at 550-51). Because the issue of habitual residence is a fact-intensive inquiry, courts have not articulated a bright-line rule as to when a child is old enough to develop a set routine. *Id.*

In *Whiting*, the Third Circuit found that a four-year-old child possessed this ability because he was "able to develop a certain routine and acquire a sense of environmental normalcy" and was "not only aware of those around him, but [was] able to form meaningful connections with the people and places he encounter[ed] each day." *Whiting*, 391 F.3d at 550-51. A child who reaches this age of maturity is "capable of being firmly rooted in a new country," and, accordingly, a court will "attach greater significance to acclimatization and give less weight to shared parental intent." *Blackledge*, 866 F.3d at 181 (internal quotations omitted).

Here, the Court finds that D.S. has developed a set routine and acquired a sense of environmental normalcy. Unlike when she was in Israel, D.S. is attending a school in New Jersey where she speaks the language in which the classes are instructed. She can interact with teachers and fellow students, something that was very difficult for her when she resided in Israel. D.S.'s inability to communicate in the language spoken at her Israeli school forced her to repeat kindergarten in the United States. (Decl. of Basya Bamberger ¶ 5.) Ms. Bamberger also noted that despite this impediment, D.S. is currently "thriving" in the school environment. (*Id.* ¶ 6.)

Finally, because R.S. is three years old, the Court considers both the "very young child" standard articulated in *Karkkainen*, and the acclimatization factors it considered for D.S. As with M.S., there was a shared parental intent for R.S. to remain in New Jersey for at least a limited period of time. Turning to the acclimatization factors, R.S.'s preschool teacher described her as being a "social, very alert child and eager learner" who had "many friends at school." (Decl. of Rivkie Schuster ¶ 7.) Considering R.S.'s young age and her rapid acclimation to an educational environment where she is able to speak the language, the Court finds R.S. has developed a set

24

routine and acquired a sense of environmental normalcy. Due to these factors, the Court finds R.S.'s habitual residence on August 22, 2019 was New Jersey.

The Court has carefully weighed both the evidence of shared parental intent and the acclimatization of the Minor Children, and finds the Minor Children were habitually resident in New Jersey on August 22, 2019.

### d. Whether the Retention of the Minor Children Breached Petitioner's Custody Rights

Having determined the Minor Children were habitually resident in New Jersey on August 22, 2019, the Court considers whether Respondent's retention breached Petitioner's custody rights and was, therefore, "wrongful." *See Feder*, 63 F.3d at 225. Because the Court finds the Minor Children were habitually resident in New Jersey on the date of the alleged retention, the Court finds Petitioner's custody rights were not breached and, therefore, the retention was not wrongful under the Hague Convention. *See, e.g.*, *Blackledge*, 866 F.3d at 188 (holding that because the child was a habitual resident of the United States immediately prior to the retention date, the "retention therefore was not wrongful under the Hague Convention"); *Karkkainen*, 445 F.3d at 298 (same); *Sasson*, 327 F. Supp. 2d at 501–02 (same); *Holder v. Holder*, 392 F.3d 1009, 1021 (9th Cir. 2004) (same); *see also Meredith*, 759 F. Supp. at 1436 ("[t]o invoke the protection of the Convention, the taking or retention of a minor child must have occurred from a place where the child habitually resides").

The Court, therefore, holds the Minor Children were not wrongfully retained by Respondent in New Jersey. Because M.S. was not wrongfully removed and because the Minor Children were not wrongfully retained, the Court, accordingly, denies the Petition.[15]

## III.   CONCLUSION

Based on the foregoing, and for other good cause shown, the Petition is denied. The Court will issue an Order consistent with this Memorandum Opinion.

s/ Michael A. Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

**Dated:** December 12, 2019

---

[15] Respondent raises several affirmative defenses recognized by the Convention: (1) Petitioner consented to the Minor Children's residence in New Jersey (Resp't Opp'n Br. ¶ 59, ECF No. 29; *see* Hague Convention art. 13(a)); (2) Petitioner acquiesced to the Minor Children's residence in New Jersey (*Id.* ¶ 60; *see* Hague Convention art. 13(a)); (3) the Minor Children have developed a significant connection to the State of New Jersey, have become accustomed to the environment, and are otherwise "well-settled" in New Jersey; (*Id.* ¶ 62; *see* Hague Convention art. 12); and (4) return of the Minor Children would violate public policy and fundamental principles relating to the protection of human rights (*Id.* ¶ 63; *see* Hague Convention art. 20). Because the Court finds Petitioner did not establish a prima facie case for a wrongful removal or retention, the Court does not reach the merits of Respondent's asserted affirmative defenses.